UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM JONES #168654,

                Petitioner,                          Hon. Robert J. Jonker

v.                                            Case No. 1:15-CV-1338

JACK KOWALSKI,

                Respondent.

_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Jones' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Jones' petition be denied.

**BACKGROUND**

Following an incident that occurred in the early morning hours of November 21, 2010, Petitioner was charged with three counts of first-degree criminal sexual conduct and one count of first-degree home invasion. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below. The testimony has been organized herein into three categories: (1) the 2010 incident involving Chandra Nyhof, (2) a 1981 incident involving Lisa Moore, and (3) a 2004 incident involving Lori Cuti.

## I.      Chandra Nyhof Incident

<u>Kurt Medendorp</u>

As of November 21, 2010, Medendorp was employed as a Muskegon County Deputy Sheriff.  (ECF No. 24-7, PageID.2609, Trial Transcript, July 12, 2011, at 287).  Early that morning, Medendorp and Deputy Sheriff Amy Fekken were dispatched to investigate an incident in Fruitport Township.  (*Id.* PageID.2609-10). Shortly after Medendorp and Fekken arrived at the subject location, several other law enforcement officers also arrived.  (*Id.* PageID.2610-11).

Medendorp and Fekken entered the residence and encountered Chandra Nyhof who appeared "visibly upset."  (*Id.* PageID.2613).  Nyhof reported that she had been raped and described her assailant as a "clean shaven" African-American man approximately 6 feet, 3 inches tall.  (*Id.* PageID.2615-16).  Nyhof indicated that her assailant appeared to have entered through a window.  (*Id.*).

An investigation of the exterior of the cabin in which Nyhof resided revealed the presence of "very fresh" footprints in a pattern "going back and forth like they were looking through a window."  (*Id.* PageID.2616-17).  Medendorp also discovered that the screen had been removed from one of the windows and discarded nearby. (*Id.* PageID.2617).

Nyhof reported that she was unable to see her assailant's face because, during the assault, her head had been covered with a musty smelling blanket.  (*Id.* PageID.2616).  When Nyhof was asked if she knew of any black men who lived in the

vicinity, Nyhof identified Tony Jones, the "maintenance guy" who worked for the resort where she lived.  (*Id.* PageID.2616, 2619).  According to Nyhof, Jones was "probably" at a nearby residence located on Nestrom Road and would be driving a 2002 Ford Explorer.  (*Id.* PageID.2619).

Medendorp went to the location in question and, upon arrival, observed the Ford Explorer Nyhof described.  (*Id.* PageID.2621).  Medendorp examined the Explorer and noted that despite an outside temperature in "the low 30s," the brake rotors and engine compartment were both radiating heat indicating that car had "been driven recently."  (*Id.*).  Medendorp looked inside the Explorer and observed a steak knife, a grass-stained sock, and a blanket.  (*Id.* PageID.2622).  Further examination revealed the presence of "the same type of [tire] tread marks there as at the scene of the crime."  (*Id.* PageID.2624).  When officers knocked on the door nobody responded, so a search warrant was obtained.  (*Id.* PageID.2622-23).

<u>Michael Poulin</u>

As of November 21, 2010, Poulin, a Captain with the Muskegon County Sheriff's Department, was the tactical commander of the Department's SWAT team. (ECF No. 24-8, PageID.2692, Trial Transcript, July 13, 2011, at 46).  At some point that morning, Poulin was directed to report to the Nestrom Road residence where officers suspected Jones was hiding.  (*Id.* PageID.2693-94).  Shortly before 10:00 that morning, a search warrant was obtained and officers entered the residence where Petitioner was discovered hiding inside a bed frame.  (*Id.* PageID.2694-99).

<u>Brian Harris</u>

As of November 21, 2010, Harris was employed as a Detective with the Muskegon County Sheriff's Department.    (ECF No. 24-8, PageID.2705, Trial Transcript, July 13, 2011, at 59).    Early that morning, Harris was dispatched to Chandra Nyhof's residence to investigate and collect evidence.    (*Id.* PageID.2705-06).

When Harris investigated the exterior of Nyhof's residence, he discovered that the screen had been removed from one of the windows.    (*Id.* PageID.2713-14). Directly under this window, Harris observed a cinder block with "footprints around it."    (*Id.* PageID.2713).    Harris noted that, for this particular window to have been opened from the outside, the interior latch would have had to have first been disengaged.    (*Id.* PageID.2755-56).

Harris later travelled to the Nestrom Road residence where Petitioner was captured.    (*Id.* PageID.2726-27).    An investigation of the apartment where Petitioner had been hiding revealed a "bottle of personal lubricant" in a trash can and a second bottle of lubricant on a bedroom dresser.    (*Id.* PageID.2729-30).    An examination of the Ford Explorer located at this residence revealed a knife, a heavy "cargo" blanket, and a cellphone.    (*Id.* PageID.2727-29).

<u>Brent Sowles</u>

As of November 21, 2010, Sowles was employed as a Detective with the Muskegon County Sheriff's Department.   (ECF No. 24-10, PageID.3174, Trial Transcript, July 14, 2011, at 200-01).   Early that morning, Sowles was dispatched to participate in the investigation of the sexual assault of Chandra Nyhof.   (*Id.* PageID.3175).

As part of this investigation, Sowles interviewed Petitioner.   (*Id.* PageID.3178).   Initially, Petitioner was not informed why he was being questioned. (*Id.* PageID.3219-20).   Petitioner reported that he was employed as a groundskeeper for a local residential property.   (*Id.* PageID.3192).   With respect to his actions on the night in question, Petitioner offered several different versions.

Petitioner first indicated that he was at Tara Lynn Glaser's residence, but departed at approximately 10:30 p.m. to go the Tipsy Toad.   (*Id.* PageID.3200-01). According to Petitioner, he later telephoned a woman named Melissa who met Petitioner at his apartment where the pair "hooked up."   (*Id.* PageID.3201). Petitioner stated that Melissa left his apartment at approximately 2:30 a.m. after which he stayed.   (*Id.* PageID.3201-02).   Petitioner later modified his story, stating that after Melissa exited his apartment, he went to a gas station for beer and cigarettes.   (*Id.* PageId.3203).

Once Petitioner realized, however, that he was being questioned about "something [that] happened to" Chandra Nyhof, Petitioner's version of events changed yet again. (*Id.* PageID.3206-07). Specifically, Petitioner then stated that, after leaving Tara Lynn Glaser's residence, he did not "hook up" with Melissa, but instead "went on down to Chandra's place for a booty call." (*Id.* PageID.3207). Petitioner stated that, when he arrived at Nyhof's residence, the "two of them engaged in conversation" and "ended up having sex." (*Id.* PageID.3208). Petitioner stated that he had been "kickin' it" with Nyhof for about six weeks during which time the two had sex "quite a few times." (*Id.*). Petitioner stated that nobody knew about their "relationship," however. (*Id.* PageID.3210). Petitioner further stated that Nyhof had been "having trouble with" her boyfriend and had even asked Petitioner to beat up her boyfriend. (*Id.* PageID.3224).

When confronted with the discrepancies in his statements, Petitioner changed his story yet again. (*Id.* PageID.3211-12). Specifically, Plaintiff stated that he did not depart Tara Lynn Glaser's residence until 11:30 p.m. after which he went to the Tipsy Toad and met with a person named Sherrod. (*Id.*). Petitioner further stated that, after leaving the Tipsy Toad, he travelled to Chandra Nyhof's residence where the two engaged in consensual sex. (*Id.*).

Jennifer Fornaro

As of November 21, 2010, Fornaro was employed as a Sexual Assault Nurse Examiner.   (ECF No. 24-8, PageID.2795, Trial Transcript, July 13, 2011, at 150-51). That morning, Fornaro conducted a sexual assault examination of Chandra Nyhof. (*Id.* PageID.2797).   As part of this examination, Fornaro completed a rape kit.   (*Id.* PageID.2797-98).   A physical examination of Nyhof did not reveal any abnormalities, which Fornaro indicated was not unusual in sexual assault cases.   (*Id.* PageID.2800).

As part of this examination, Nyhof described the details of her assault.   (*Id.* PageID.2800-01).   Nyhof reported that she "woke up to him laying on top of me." (*Id.* PageID.2801).    Nyhof was sexually assaulted multiple times and was blindfolded during the entire encounter.   (*Id.* PageID.2801-02).   After each assault, Nyhof was forced to take a shower.   (*Id.*).   Nyhof was also forced to wash out her mouth with soda.   (*Id.* PageID.2802).   The rapist told Nyhof that she was "beautiful" and asked her "if she had ever been with any other ethnicity."   (*Id.* PageID.2801). The rapist later warned Nyhof that she would be killed if she "told anyone."   (*Id.* PageID.2802).

Kirk DeLeeuw

DeLeeuw, a Michigan State Police forensic scientist, processed the rape kit obtained from Chandra Nyhof.   (ECF No. 24-8, PageID.2808, Trial Transcript, July 13, 2011, at 162-64).   An examination of the rape kit revealed no evidence of seminal fluid or sperm cells.   (*Id.* PageID.2810-11).   Such a result was not unlikely given

7

Nyhof's statement that she had been forced to wash her mouth and vaginal area following her assault. (*Id.* PageID.2812). DeLeeuw subsequently examined a sock, blanket, and two pillow cases recovered from Nyhof's residence. (*Id.* PageID.2812-13). The blanket contained five stains that contained seminal fluid and sperm cells. (*Id.* PageID.2813-14).

Ann Hunt

Hunt, a medical technologist with the Michigan State Police Department of Forensic Science, performed DNA analysis on the material Kirk DeLeeuw recovered from Chandra Nyhof's blanket. (ECF No. 24-8, PageID.2821, Trial Transcript, July 13, 2011, at 176-80). Of the five stains DeLeeuw identified, two were determined to contain DNA from Chandra Nyhof and Petitioner. (*Id.* PageID.2826-33).

Charles Christenson

As of November 21, 2010, Christenson was assigned to the Michigan State Police Internet Crimes Against Children Task Force and assisted with "technology related" investigations. (ECF No. 24-8, PageID.2868, Trial Transcript, July 13, 2011, at 222-23). Christenson assisted Detective Lisa Freres with examining Petitioner's cellphone. (*Id.* PageID.2869-72). An examination of Petitioner's phone revealed information regarding "the recent calls" that were made using the phone, but Christenson was unable to determine when the calls in question were made. (*Id.* PageID.2872-74).

Amy Fekken

As of November 21, 2010, Fekken was employed as a Muskegon County Deputy Sheriff. (ECF No. 24-8, PageID.2883, Trial Transcript, July 13, 2011, at 237). Fekken and Deputy Medendorp were dispatched early that morning to investigate an assault on Chandra Nyhof. (*Id*.). Upon arriving at the crime scene, Fekken spoke with Nyhof. (*Id*.).

Nyhof reported that the first thing her assailant did was wrap a musty-smelling blanket over her face. (*Id*.). Nyhof reported that her assailant used a lubricant when assaulting her. (*Id*. PageID.2884-85). The man assaulted Nyhof multiple times, forcing Nyhof to shower after each assault. (*Id*. PageID.2885, 2888-89). After assaulting Nyhof for the final time, the assailant "pick[ed] up all the evidence" and exited the residence. (*Id*. PageID.2885-489).

Lisa Freres

Freres, a Detective with the Muskegon County Sheriff's Department, examined Petitioner's cell phone with the assistance of Charles Christenson. (ECF No. 24-9, PageID.2934, Trial Transcript, July 14, 2011, at 7). This examination revealed no evidence that Petitioner ever called, or received a call from, Chandra Nyhof. (*Id*. PageID.2934-35). There was likewise no evidence that Nyhof's phone number was otherwise recorded or stored in Petitioner's phone. (*Id*. PageID.2935).

<u>Chandra Nyhof</u>

In the early morning hours of November 21, 2010, Nyhof was awakened by a man who had entered her bedroom.   (ECF No. 24-10, PageID.3013, Trial Transcript, July 14, 2011, at 39-45).   Nyhof determined that the man entered her residence by climbing through a window because not all the windows were locked on the night in question.   (*Id.* PageID.3028-29).

The man removed Nyhof's clothes and began sexually assaulting her.   (*Id.* PageID.3019-21).   Before penetrating Nyhof, the man stated that he was placing lubricant on his penis.   (*Id.* PageID.3022).   Nyhof did not own lubricant, however, so the man must have brought the lubricant with him.   (*Id.*).   The man sexually assaulted Nyhof multiple times, forcing her to shower after each encounter.   (*Id.* PageID.3022-35).   During the course of raping Nyhof, the man asked Nyhof various questions, including whether she had ever had sex with a black man.   (*Id.* PageID.3037-38).

Before departing, the man told Nyhof that, if she contacted the police, he would kill her, her family, and her friends.   (*Id.* PageID.3036-39).   The man also forced Nyhof to rinse out her mouth with soda.   (*Id.* PageID.3040).   Nyhof told the police that she suspected that her assailant was the man who performed maintenance within the complex where she resided.   (*Id.* PageID.3043-44).   Nyhof described her assailant as a tall black man whose body had been shaven.   (*Id.* PageID.3027, 3038).

<u>Melissa Sweney</u>

Sweney met Petitioner in 2005 and the two developed a friendship. (ECF No. 24-9, PageID.2942, Trial Transcript, July 14, 2011, at 15-16). The relationship later "developed into something a little more" and, in October 2010, Sweney moved in with Petitioner. (*Id.* PageID.2943-46). On two occasions, Sweney encountered other women at Petitioner's residence. (*Id.* PageID.2946). Sweney learned that one of the women was Tara Lynn Glaser, but she did not know the identity of the other woman. (*Id.* PageID.2947). Sweney was later shown an image obtained from the internet which Petitioner's counsel claimed was of Chandra Nyhof. (*Id.* PageID.2947-64). Sweney identified this person as the second woman she observed at Petitioner's residence. (*Id.* PageID.2947-65). According to Sweney, she caught a "glance" of this woman outside of Petitioner's residence on November 18, 2010. (*Id.* PageID.2964, 2971).

<u>Lori Moser</u>

Moser was employed as a bus driver who had spent the previous three summers cleaning the cabins at the resort where Chandra Nyhof resided. (ECF No. 24-11, PageID.3240, Trial Transcript, July 15, 2011, at 12-13). Regarding the cinder block that police observed outside Nyhof's residence, Moser reported that it had been sitting in that location "as long as I've worked there." (*Id.* PageID.3242-44). When cleaning the cabins Moser never needed a key because "nothing's ever locked" at the resort. (*Id.* PageID.3246). Also, the cabins are not air conditioned, so screens were

11

located on all the windows. (*Id.* PageID.3249). Moser never observed Chandra Nyhof speaking with or in the company of Petitioner. (*Id.* PageID.3252).

<u>Lynn Glaser</u>

Glaser hired Petitioner in 2009 to perform "odd jobs" for her and her property. (ECF No. 24-11, PageID.3311, Trial Transcript, July 15, 2011, at 83-86). Glaser described Petitioner as "an adopted son" and gave him "run of" her residence. (*Id.* PageID.3316, 3325). Glaser also permitted Petitioner to reside in another house she owned. (*Id.* PageID.3331-32). Glaser helped Petitioner obtain a driver's license and she allowed Petitioner to drive her vehicles. (*Id.* PageID.3314-16). Glaser knew when she hired Petitioner that he was a convicted felon, but she never asked Petitioner the crime of which he had been convicted. (*Id.* PageID.3361). Glaser owned a Ford Explorer which Petitioner "borrowed" on the night in question. (*Id.* PageID.3291-92).

In the Spring of 2009, Chandra Nyhof and Scott Plank moved into one of Glaser's rental properties. (*Id.* PageID.3276). In February 2010, Nyhof moved out of her residence with Plank because their relationship was "not working." (*Id.* PageID.3277-78, 3281-82). In April 2010, Nyhof returned and rented a cabin of her own. (*Id.* PageID.3281-82). The following month, Nyhof indicated to Glaser that she needed to begin exercising. (*Id.* PageID.3282). Glaser suggested to Nyhof that she "run with [Petitioner] because [he] ran all the time." (*Id.* PageID.3283). Nyhof

12

declined, indicating that she had been watching Petitioner work out on the beach and "could never keep up with him."  (*Id.*).

Glaser was not surprised that Petitioner's footprints might be discovered near Nyhof's residence because Petitioner's work duties included tasks such as cutting the grass and sweeping down spider webs.  (*Id.* PageID.3283-85).  Nyhof later spoke with Glaser on two separate occasions thanking her for work Petitioner performed. (*Id.* PageID.3285-86).  When speaking about this to Glaser, Nyhof referred to Petitioner by name.  (*Id.* PageID.3286).  There was nothing in these conservations that led Glaser to believe that Nyhof was "creeped out" by Petitioner.  (*Id.*).  When Glaser once related to Nyhof that Petitioner considered Nyhof to be a "nice looking woman," Nyhof was "absolutely flattered."  (*Id.* PageID.3287).

Glaser asserted that, despite her relationship with Petitioner or the fact that her daughter, Tara, was then in a relationship with Petitioner and was also paying the cost of Petitioner's defense attorney, her objectivity regarding Petitioner was not compromised.  (*Id.* PageID.3317, 3326-27).

Ashley Bush

Bush is Chandra Nyhof's daughter.  (ECF No. 24-11, PageID.3410, Trial Transcript, July 15, 2011, at 182).  The day prior to Nyhof's assault, Bush stayed at her mother's cabin.  (*Id.* PageID.3410-11).  Nyhof spent the day sleeping.  (*Id.* PageID.3410).

<u>Darlene Krause</u>

As of November 20, 2010, Krause operated the Tipsy Toad Tavern.   (ECF No. 24-11, PageID.3428, Trial Transcript, July 15, 2011, at 200-01).   As of this date, Krause employed a man named Sherrod, but he was not at work that night.   (*Id.* PageID.3428-29).

## II.    **Lisa Moore Incident**

<u>Lisa Moore</u>

Moore testified regarding an incident that occurred on August 28, 1981.   (ECF No. 24-8, PageID.2907, Trial Transcript, July 13, 2011, at 261).   Early that morning, Moore awoke when a man placed a hand over her mouth and a knife against her throat.   (*Id.* PageID.2908-09).   The man told Moore that if she made a sound, he would kill her.   (*Id.* PageID.2909).   The man then raped Moore.   (*Id.* PageID.2909-10).   It was subsequently discovered that Moore's assailant entered the residence through a window.   (*Id.* PageID.2911).   Moore was able to identify her assailant to police.   (*Id.* PageID.2912).

<u>William Jones</u>

Petitioner was charged with sexually assaulting Lisa Moore and testified at his 1981 criminal trial.   Petitioner's prior testimony was read into the record at his 2011 trial.

14

Petitioner conceded having sex with Lisa Moore on the night in question, but asserted that it was consensual.  (ECF No. 24-10, PageID.3153, Trial Transcript, July 14, 2011, at 179-87).   Petitioner met Moore approximately ten days before, after which the pair began having sex at Moore's residence.   (*Id.* PageID.3156-58).   On the night in question, Petitioner again went to Moore's residence.   (*Id.* PageID.3159-61).   After arriving, Petitioner and Moore smoked marijuana.   (*Id.* PageID.3160-64).  Petitioner then informed Moore that he was "going to break up with her."   (*Id.* PageID.3160-61).   Moore responded by asking Petitioner if he wanted to have sex.  (*Id.* PageID.3161).   Petitioner agreed and the two engaged in consensual sex.   (*Id.*).

Moore later alleged that Petitioner raped her because she became jealous after seeing Petitioner with another girl.   (*Id.* PageID.3158-59, 3167-69).   Petitioner also conceded, however, that when initially questioned by the police regarding this matter he denied being at Moore's residence on the night in question.   (*Id.* PageID.3166).  Petitioner also failed to mention that he allegedly had sex with Moore several times previously.   (*Id.*).

<u>John Solokis</u>

Solokis testified at Petitioner's 1981 criminal trial.   Solokis' testimony was read into the record at Petitioner's 2011 trial.

As of August 28, 1981, Solokis was employed as a Muskegon Heights police officer.   (ECF No. 24-8, PageID.2838, Trial Transcript, July 13, 2011, at 192).  Solokis spoke with Lisa Moore that morning regarding her assault.   (Trial

15

Transcript, July 13, 2011, PageID.2839-42).    Moore did not know the name of her assailant, but she indicated that she could identify him having seen him previously in the neighborhood.    (*Id.* PageID.2841-42).    An investigation of Moore's residence revealed a partial footprint on a table located below a window.    (*Id.* PageID.2842-44).    While in Moore's residence, Solokis discerned no indication that marijuana had recently been burned or smoked therein.    (*Id.* PageID.2863).

> Francis Rokos

Rokos testified at Petitioner's 1981 criminal trial.    Rokos' testimony was read into the record at Petitioner's 2011 trial.

As of August 28, 1981, Rokos was employed as a Sergeant for the Muskegon Heights Police Department.    (ECF No. 24-8, PageID.2845, Trial Transcript, July 13, 2011, at 199).    Rokos assisted in the investigation of the rape of Lisa Moore.    (*Id.* PageID.2845).    As part of his efforts, Rokos examined the exterior of Moore's residence and observed what appeared to be "shoe marks" on the siding directly underneath a window.    (*Id.*).    While in Moore's residence, Rokos discerned no indication that marijuana had recently been burned or smoked therein.    (*Id.* PageID.2865).

<u>John Scott</u>

Scott testified at Petitioner's 1981 criminal trial.    Scott's testimony was read into the record at Petitioner's 2011 trial.

As of August 28, 1981, Scott was employed as a Detective for the Muskegon Heights Police Department.    (ECF No. 24-8, PageID.2849, Trial Transcript, July 13, 2011, at 203).    Scott also assisted in the investigation of the rape of Lisa Moore. (*Id.*).    Scott examined the exterior of Moore's residence and observed "prints" on the siding indicating "that someone tried to scale the wall."    (*Id.* PageID.2850).    While in Moore's residence, Scott discerned no indication that marijuana had recently been burned or smoked therein.    (*Id.* PageID.2866).

Later that day, Scott spoke with Petitioner.    (*Id.* PageID.2854-56).    As part of the investigation, Moore identified Petitioner from a line-up as her rapist.    (*Id.* PageID.2854).    When Scott informed Petitioner that he had been accused of raping Lisa Moore, Petitioner denied it, asserting that "he had been home all night."    (*Id.* PageID.2856, 2859-60).    Following his preliminary examination, however, Petitioner conceded that he had sex with Lisa Moore on the date in question.    (*Id.* PageID.2857-58).    Petitioner asserted that the encounter was consensual and that the pair had sex previously.    (*Id.* PageID.2858).

III.   **Lori Cuti Incident**

Lori Cuti

Cuti testified about certain events that occurred in July and August 2004.   In mid-July 2004, Cuti was attempting to sell her truck.   (ECF No. 24-11, PageID.3431, 3434-36, Trial Transcript, July 15, 2011, at 203, 206-08).   Petitioner encountered Cuti at a gas station where he observed a for-sale sign in her truck.   (*Id.* PageID.3435-39).   Cuti lived alone as her boyfriend was temporarily out-of-state for military service.   (*Id.* PageID.3436).   Petitioner telephoned Cuti "a couple nights later" and asked if he could "come over and look at the vehicle, take it for a ride."   (*Id.*).   Cuti agreed and Petitioner arrived at her residence a short time later.   (*Id.*).

Petitioner indicated, however, that he did not have a driver's license because he had recently been incarcerated on a felony conviction.   (*Id.* PageID.3439-40).   Cuti considered it unusual that somebody without a driver's license would be interested in purchasing a vehicle.   (*Id.* PageID.3444).   Nevertheless, Cuti agreed to drive Petitioner a short distance in her truck.   (*Id.* PageID.3435).   During this "test drive," Petitioner told Cuti that she "had nice legs."   (*Id.* PageID.3443).   This made Cuti feel "uncomfortable" and "just kinda wanting to get him out of my car."   (*Id.*).

At the conclusion of this "test drive," Cuti entered her residence and Petitioner walked away.   (*Id.* PageID.3444-45).   A "few minutes" later, however, Petitioner returned and asked Cuti to drive him to his sister's residence, which Cuti did.   (*Id.*

PageID.3445-46).   Several nights later, at approximately 10:00 p.m., Cuti heard somebody knocking on her front door.   (*Id.* PageID.3449).   When Cuti answered the door, she observed Petitioner standing there holding a "brown paper bag."   (*Id.*). Petitioner asked Cuti if she wanted to "have a few drinks" with him.   (*Id.*).   Cuti, feeling "weirded out," declined Petitioner's offer.   (*Id.* PageID.3449-50).

Approximately ten days later, at approximately 3:00 a.m., Cuti was awakened by what she thought was her boyfriend's arm covering her mouth.   (*Id.* PageID.3432, 3450).   Cuti's boyfriend then realized that his face had been scratched, presumably by Cuti.   (*Id.* PageID.3432-33).   When Cuti went to her bathroom to retrieve items to clean her boyfriend's face, she realized that the screen to her bathroom window had been removed and various items in her bathroom re-arranged.   (*Id.* PageID.3433).

Cuti immediately ran outside and contacted the police because she thought whoever had broken into her house was still inside.   (*Id.* PageID.3433-34).   Cuti then realized that her boyfriend's face had not been scratched, but had instead been cut.   (*Id.* PageID.3433).   When the police arrived and investigated Cuti's bedroom, they discovered "some condoms" that were not there previously.   (*Id.* PageID.3434).

<u>Dloria Roberson</u>

Roberson is Petitioner's sister.   (ECF No. 24-11, PageID.3456-57, Trial Transcript, July 15, 2011, at 227-28).   In July 2004, Petitioner was living with Roberson.   (*Id.* PageID.3457).   At the end of July, however, Petitioner moved "down south" with other family members.   (*Id.*).

<u>Kory Luker</u>

Luker participated in the investigation of the August 3, 2004 incident at Lori Cuti's residence.   (ECF No. 24-11, PageID.3459, Trial Transcript, July 15, 2011, at 230).   This investigation failed to uncover evidence sufficient to charge anybody with a crime.   (*Id.* PageID.3461-62).

Following the presentation of evidence, the jury found Petitioner guilty of three counts of first degree criminal sexual conduct and one count of first-degree home invasion.   (ECF No. 24-13, PageID.3680-81, Trial Transcript, July 18, 2011, at 103-04).   Petitioner was sentenced to serve 18-30 years in prison on the home invasion conviction and 51-80 years on the criminal sexual conduct convictions, all the sentences to run concurrently.   (ECF No. 21-11, PageID.841-44, Sentencing Transcript, August 8, 2011, 10-13).

Petitioner appealed his convictions in the Michigan Court of Appeals asserting the following claims:

I.    The trial court erred in admitting irrelevant and highly prejudicial prior bad acts evidence of a 29 year-old incident alleged to have occurred when Petitioner was 17 years old, as well as a 7 year-old incident that was never connected to Petitioner other than by bald speculation.

20

II.    Defense counsel was constitutionally ineffective in failing to foresee subsequent rulings from the trial court that affected a strategic decision that Petitioner would not testify when counsel told the jury in opening statements that Petitioner would testify on the key defense issue of consent.

III.    The trial court erred in denying the parties' joint motion for a mistrial during voir dire after the judge exposed jurors to evidence regarding the complainant's mental health issues that was ruled inadmissible.

IV.    Numerous instances of prosecutorial misconduct in closing argument deprived Petitioner of his due process right to a fair trial.

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Jones*, 2014 WL 576198 (Mich. Ct. App., Feb. 11, 2014).    Raising issues I-II and IV, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal. *People v. Jones*, 853 N.W.2d 377 (Mich. 2014).

Petitioner initiated the present action on December 28, 2015, asserting issues I-II and IV above.    (ECF No. 1).    Contemporaneous with his habeas petition, Petitioner requested that the Court stay this matter so that he could return to state court to pursue additional claims for relief.    (ECF No. 3).    On January 25, 2016, the Honorable Robert J. Jonker granted Petitioner's request and this matter was administratively closed.    (ECF No. 10).

On February 24, 2016, Petitioner filed in the trial court a motion for relief from judgment in which he asserted the following claims:

I.    Newly discovered evidence provides that defendant was denied due process under the Fifth, Sixth and Fourteenth Amendments where perjury was used to circumvent the defense theory of consent.    Thus, the prosecutor and trial court allowed the perjury to go uncorrected and

trial and appellate counsel were both equally ineffective for failing to investigate and address this obvious issue.   Trial counsel was also ineffective for failing to call witnesses.

II.    Defendant was denied due process protections when the trial court abused its discretion when allowing an overly suggestive in-court identification.    This evidentiary error also denied Defendant the effective assistance of counsel at a critical stage of the proceedings. Appellate counsel was ineffective for failing to raise this issue.

III.    Defendant was denied his due process right to present a defense where counsel misinformed him of his statutory right to take a polygraph examination to avail himself of the allegations of the complainant therein obviating the need for a trial in the first place.   Appellate counsel was ineffective for not raising this issue.

IV.    Defendant was denied equal protection of law where his jury pool only consisted of 2.8% African-Americans.   Thus, raising a serious question of the jury selections integrity.   Trial counsel was ineffective for failing to raise this issue.

The trial court denied Petitioner's motion for relief from judgment.   (ECF No. 21-13, PageID.988-98).   Asserting the same four issues, Petitioner appealed this decision to the Michigan Court of Appeals and Michigan Supreme Court, both of which likewise denied relief.   (ECF No. 21-17, PageID.1340; ECF No. 21-18, PageID.1491).   The Court subsequently re-opened this matter and accepted for filing Petitioner's amended petition for writ of habeas corpus in which Petitioner asserts claims I-II and IV asserted on direct appeal and claims I-IV asserted in his post-conviction motion for relief from judgment.[1]

---

1 In support of his claims in this Court, Petitioner is relying on the briefs and pleadings he filed in support of his various state court appeals and requests for relief.

22

## <u>STANDARD OF REVIEW</u>

Jones' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."   *Bell v. Cone*, 535 U.S. 685, 693 (2002). As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."   *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."   *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting

*Williams v. Taylor*, 529 U.S. 362, 405 (2000)).   A writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.   *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.   Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein.   This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S. 86, 100 (2011). Instead, if a state court rejects a federal claim, a federal habeas court "*must presume that the federal claim was adjudicated on the merits.*" *Johnson v. Williams*, 568 U.S.

24

289, 301 (2013).  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## ANALYSIS

### I.    Procedural Default

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground generally precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).  If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

Respondent argues that several of the claims asserted by Petitioner in this Court have been procedurally defaulted.  The Court, however, is not obligated to address Respondent's procedural default arguments and can instead simply decide Jones' petition on the merits.  *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525

25

(1997) (recognizing that "judicial economy" may justify addressing a habeas petition on the merits rather than addressing complicated procedural default questions).

Rather than attempt to navigate potentially difficult questions of procedural default law, for which there may not be clear answers, and potentially waste scarce judicial resources should the Court's analysis of such later be found in error, the Court opts to simply address Petitioner's claims on the merits.    *See, e.g., McLemore v. Bell*, 503 Fed. Appx. 398, 404 (6th Cir., Oct. 31, 2012) (observing that when facing "the analytical morass in which procedural-default rules ensnare us," "[a]n analysis of the merits of the petitioner's substantive claims presents a more straightforward ground for decision").   The Court finds that Respondent is not prejudiced by such because even addressed on the merits, Petitioner's claims do not entitle him to relief.

## II.    Evidentiary Error

As noted above, evidence regarding prior incidents involving Lisa Moore and Lori Cuti was admitted at trial.   Petitioner argues that the admission of this evidence was improper pursuant to Michigan Rules of Evidence 403 and 404(b). Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.   *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v.*

26

*Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.   *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law."   *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).   Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.   *Id.*   In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."   *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not "require a perfect trial," *Clemmons*, 34 F.3d at 358; moreover, courts have defined those violations that violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."   *Id.*   As is well recognized, however, the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.   *Bugh*, 329 F.3d at 512-13 ("there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting

propensity evidence in the form of other bad acts evidence"); *Burger v. Prelesnik*, 826 F.Supp.2d 997, 1010-11 (E.D. Mich. 2011) (same).

Petitioner has advanced no argument that the introduction of this evidence violated any fundamental right or principle.   Moreover, the Court finds persuasive the analysis by the Michigan Court of Appeals that introduction of the evidence in question was consistent with Michigan evidentiary law and did not violate Petitioner's right to a fair trial.   *Jones*, 2014 WL 576198 at *12-17.   Finally, in the absence of Supreme Court authority holding that the admission of evidence of prior bad acts violates the Constitution, laws, or treaties of the United States, Petitioner is not entitled to habeas relief.   *Bugh*, 329 F.3d at 512-13.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.    Use of False Testimony

At trial, Petitioner's theory was that he and Chandra Nyhof engaged in a consensual sexual relationship during the course of which Nyhof asked Petitioner to "take care of" her physically abusive boyfriend.   (ECF No. 24-10, PageID.3123-24, Trial Transcript, July 14, 2011, at 149-50; ECF No. 24-13, PageID.3626, 3633, 3635, 3645, Trial Transcript, July 18, 2011, at 49, 56, 58, 68).   Petitioner asserts that Nyhof committed perjury when she testified that her boyfriend never hit her.   Petitioner argues that because the prosecutor failed to correct Nyhof's false testimony, his right to a fair trial was violated.

28

As is well recognized, "[t]he knowing use of perjured testimony, including the failure to correct false testimony, constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Foley v. Parker*, 488 F.3d 377, 391-92 (6th Cir. 2007) (citing *Napue v. Illinois*, 360 U.S. 264, 272 (1959)).   This standard encompasses the use of testimony, "whether elicited or left uncorrected," that the prosecutor knows is false.   *Foley*, 488 F.3d at 392.

To prevail on this claim, Petitioner must demonstrate the following: (1) the statement in question was actually false not merely misleading; (2) the statement was material; and (3) the prosecutor knew the statement was false.   *See Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009) (citations omitted).   Under this standard, a statement is material if there exists "any reasonable likelihood" that the false testimony could have affected the jury's judgment.   *Id.* at 584 (citations omitted).   To properly analyze Petitioner's claim and understand why it fails, it is necessary to identify the testimony in question as well as the evidence Petitioner asserts proves the testimony false.

A.   Allegedly False Testimony

During the cross-examination of Chandra Nyhof, the following exchange occurred:

Mr. Nolan:   Did your boyfriend ever assault you?

Mr. Hedges: Objection, relevance.

Mr. Nolan:    Relevance because my client was asked to take care of that problem.

The Court:    Ask that question.

Mr. Nolan:    Did you ever ask my client to take care of your boyfriend because he hit you?

Ms. Nyhof:    No.

Mr. Nolan:    Logically, the next question would be did he ever hit you because where would my client come up with that?

The Court:    Well that's what we'll find out later perhaps.   So, what are you asking?

Mr. Nolan:    Did he ever hit you?

Mr. Hedges:    Objection.

The Court:    No, you're saying, did her boyfriend ever hit her?

Mr. Nolan:    Well yeah, how else would my client know that –

The Court:    Sustained.   You can ask her what she told your client and what he told her back.

Mr. Nolan:    Your honor, I want a motion if I could please outside the presence of the jury.

The Court:    All right.   Folks, we'll send you to the jury room.   We're trying to get through with this before we break for lunch.   So just get refreshed a bit.   We'll probably come back in here.   Thank you.

              (Jurors excused)

The Court:    Thanks.   Mr. Nolan, why don't we take the answer first.   The question is, did your boyfriend ever hit you.   Did your boyfriend ever hit you?

Ms. Nyhof:    No.

30

(PageID.3123, Trial Transcript, July 14, 2011, at 149-50).

In this exchange, Nyhof made two statements.   First, she answered "no" when asked if she ever asked Petitioner to "take care of" her boyfriend because her boyfriend had "hit" her.   Nyhof also answered "no" when asked if her boyfriend ever hit her.   It is important to note, however, that while the former statement was made in the jury's presence, the latter was not.   Petitioner has not identified, and the Court cannot locate, any subsequent exchange in which Nyhof, in the jury's presence, denied being hit by her boyfriend.

B.    Evidence Allegedly Establishing the Falsity of Nyhof's Testimony

In support of his argument that Nyhof's statements were false, Petitioner cites to two items: (1) an exchange, on the final day of trial, between the trial judge and one of his assistants, Susan Patelski, and (2) responses Chandra Nyhof provided to discovery requests in a subsequent civil action.

1.    Susan Patelski

The prosecution rested its case-in-chief on July 14, 2011.   The following day, July 15, 2011, Petitioner presented his defense and the prosecution presented its rebuttal case.   The trial resumed on July 18, 2011.   But before discussing jury instructions or proceeding to closing arguments, the court addressed an issue raised by Petitioner concerning whether Chandra Nyhof had recently been the victim of domestic violence.   (ECF No. 24-13, PageID.3582-83, Trial Transcript, July 18, 2011, at 5-6).   With respect to this issue, the trial judge asked Susan Patelski, one of his

31

assistants, whether she had contacted the jail regarding Chandra Nyhof.  (*Id.* PageID.3586).   In response, Patelski stated:

> I did.   I spoke with Sergeant Stevens.   He indicated that there was a[] domestic violence incident on July 12.   Ms. Niehoff (sic) was not lodged. The report indicated she would be the possible victim.

(*Id.*).

## 2.    Nyhof's Discovery Responses

Following the conclusion of Petitioner's criminal trial, Chandra Nyhof pursued a civil claim against Petitioner, Lynn Glaser, and others.   As part of this civil action, Nyhof, on or about February 28, 2013, provided responses to certain discovery requests.  (ECF No. 21-12, PageID.899-936).   In her discovery responses, Nyhof stated that she had been assaulted by James Jawor on four occasions: (1) summer of 2010; (2) September 2010; (3) July 2011; and (4) April 2012.   (*Id.*, PageID.916).

At Petitioner's preliminary examination, conducted on January 11, 2011, Nyhof identified James Jawor as her then current boyfriend.  (ECF No. 21-2, PageID.609, Preliminary Examination Transcript, Jan. 11, 2011, at 30).   In her aforementioned discovery responses, Nyhof indicated that she married Jawor on November 11, 2011.  (ECF No. 21-12,PageID.902).   Accordingly, while there is no indication that Jawor was identified at Petitioner's trial as Nyhof's boyfriend, the Court will nevertheless assume that Nyhof understood, at trial, the term "boyfriend" to refer to Jawor.

### C.    Analysis of Petitioner's Claim

Petitioner's claim is premised on two allegedly false statements Nyhof made at trial and the prosecutor's failure to correct such.    Petitioner's claim, however, fails for several reasons.

### 1.    Petitioner has not Shown that Nyhof's Initial Statement is False

Chandra Nyhof answered "no" when asked if she ever requested that Petitioner "take care of" her boyfriend because her boyfriend had "hit" her.    Petitioner's argument is premised on his assertion that the evidence identified in subsection B above establishes that Nyhof lied when stating that her boyfriend had never assaulted her.    But even if the Court assumes that such is the case, Petitioner's argument overlooks the compound nature of the question that was posed to Nyhof. Simply put, to establish that Nyhof's initial statement was false, Petitioner has to establish not only that Nyhof's boyfriend had previously hit her, but also that Nyhof asked Petitioner to "take care of" her boyfriend because he had hit her.    While Petitioner has presented evidence allegedly establishing the former, he has presented absolutely no evidence to establish the latter.    Thus, Petitioner cannot establish that Nyhof's initial statement was false.

### 2.    Petitioner has not Shown that Nyhof's Latter Statement is False

In her latter statement, Nyhof answered "no" when asked if her boyfriend ever hit her.    As noted above, Petitioner has presented evidence that he asserts

establishes that Nyhof lied when stating that her boyfriend never hit her.   The Court is not persuaded.

The testimony from Susan Patelski fails for several reasons to advance Petitioner's cause.   First, her testimony is hearsay.   Second, Patelski's testimony does not definitively establish that Nyhof had been assaulted, but rather, only that she had possibly been the victim of an assault.   Finally, even if it is assumed that Nyhof was assaulted on July 12, 2011, as Patelski suggests, there is no evidence that Nyhof was assaulted by her boyfriend.

As for Nyhof's subsequent discovery responses, such do not establish that Nyhof's trial testimony was false.   Instead, these discovery responses merely establish, at most, that Nyhof advanced inconsistent positions on the question whether her boyfriend ever assaulted her.   Petitioner has presented no evidence, however, demonstrating which of Nyhof's apparently inconsistent statements is true and which is false.

3.    Petitioner has not Shown that Nyhof's Latter Statement is Material

Nyhof's latter statement was her response, "no," when asked if her boyfriend ever hit her.   As previously noted, however, this statement was not made in the jury's presence.   To prevail on this claim, Petitioner must establish, in part, that there exists a "reasonable likelihood" that the allegedly false testimony could have affected the jury's judgment.   The Court fails to discern how a statement the jury

34

never heard could possibly have impacted its analysis.   Petitioner has identified no authority suggesting otherwise.

4.    Petitioner has not Shown that the Prosecutor Knew the Statements were False

Finally, even if the Court assumes that Nyhof's testimony was both false and material, Petitioner cannot establish that the prosecutor knew such to be the case. With respect to Susan Patelski's July 18, 2011, testimony, even if the Court assumes that such establishes that Nyhof was assaulted by her boyfriend on July 12, 2011, Petitioner has presented no evidence suggesting that the prosecutor knew such to be the case when Nyhof testified on July 14, 2011.   As for Nyhof's discovery responses, such were not produced until almost two years after Petitioner's criminal trial and, therefore, could not have been known to the prosecutor at the time Nyhof testified.

Petitioner asserted this claim in his post-conviction motion for relief from judgment.   The trial court rejected this claim, a decision affirmed by both the Michigan Court of Appeals and Michigan Supreme Court.   Considering the relevant authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.    Suggestive Identification

As noted above, Lori Cuti testified about a 2004 incident in which somebody apparently entered her house unlawfully.   Cuti testified that she was unable to identify who broke into her home.   (ECF No. 24-11, PageID.3437, Trial Transcript, July 15, 2011, at 209).   Cuti further testified, however, that she was able to identify Petitioner as the man who had, only a few days before the break-in of her home, been at her resident to test drive her truck and who later invited her for drinks.   (*Id.* PageID.3437-38).

On   cross-examination,   Petitioner   challenged   the   accuracy   of   Cuti's identification.   (*Id.,* PageID.3453-54).   Specifically, Petitioner asked Cuti whether she had, in fact, identified somebody else when shown a photo line-up.   (*Id.*).   Cuti responded that she did not recall, but was certain that she had identified "the person that was looking at [her] truck."   (*Id.*, PageID.3454).   Detective Luker subsequently testified that when he showed "some photos" to Cuti, as part of his investigation of her   home   invasion,   Cuti   identified   somebody   other   than   Petitioner.   (*Id.,* PageID.3462).   Petitioner asserts that his right to a fair trial was violated by Cuti's in-court testimony identifying him as the man who came to her house to look at her truck.

The due process clause protects criminal defendants from being convicted on the basis of "evidence derived from a suggestive identification procedure" that was "unnecessarily   suggestive   and   conducive   to   irreparable   mistaken   identification."

*Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (citations omitted).   It is the likelihood of misidentification that violates a criminal defendant's due process rights. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (citation omitted). Accordingly, absent "a very substantial likelihood of irreparable misidentification," identification evidence "is for the jury to weigh."   *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

To determine whether an identification procedure violated a criminal defendant's due process rights, courts employ a two-step analysis.   *Ledbetter*, 35 F.3d at 1070-71; *Haliym*, 492 F.3d at 704.   The court must first determine whether the identification procedure in question was unnecessarily suggestive.   *Ledbetter*, 35 F.3d at 1070-71; *Haliym*, 492 F.3d at 704.   Determining whether an identification procedure is unnecessarily suggestive "depends upon whether the witness's attention was directed to a suspect because of police conduct."   *Howard v. Bouchard*, 405 F.3d 459, 470 (6th Cir. 2005).

If the identification procedure is found to be unnecessarily suggestive, the court must determine "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification."   *Id.* (quoting *Manson*, 432 U.S. at 107); see also, *Ledbetter*, 35 F.3d at 1071; *Haliym*, 492 F.3d at 704.   When considering whether a suggestive identification is nonetheless reliable, the Court must consider the following factors: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness'

prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification.  *Haliym*, 492 F.3d at 704 (citations omitted).

Petitioner is correct that Cuti's testimony, coupled with Detective Luker's testimony, while not definitive, nonetheless supports the argument that Cuti's in-court identification of Petitioner as the man who considered buying her truck was inaccurate.  But it is not the mere possibility that a witness' in-court identification testimony is inaccurate that violates a defendant's right to a fair trial.  Instead, it is only where the allegedly inaccurate in-court identification testimony derives from an improperly suggestive pre-trial identification procedure that a defendant's right to fair trial is implicated.

Here, there is no evidence that the pre-trial photo lineup procedure conducted by Detective Luker was improperly suggestive or otherwise violated Petitioner's rights.  Likewise, there is no evidence that Cuti's in-court testimony was influenced by any action or statement by anybody associated with or acting at the direction of law enforcement.  Thus, Petitioner cannot establish that Cuti's in-court identification testimony violated his right to a fair trial.  As the Supreme Court has observed, absent "a very substantial likelihood of irreparable misidentification," identification evidence "is for the jury to weigh."  *Manson*, 432 U.S. at 116.  The jury heard the conflicting testimony regarding Cuti's identification of Petitioner and Petitioner was free to argue any reasonable inferences therefrom.

38

The trial court rejected this claim, a decision affirmed by both the Michigan Court of Appeals and Michigan Supreme Court.   Considering the relevant authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.    Right to Present a Defense

Under Michigan law, a person charged with committing criminal sexual conduct "shall be given a polygraph examination or lie detector test if [he] requests it."   Mich. Comp. Laws § 776.21.   Petitioner argues that he did not avail himself of this opportunity, however, because his attorney "misinformed him of his statutory right to take a polygraph examination."   Petitioner argues that, as a result, he was denied his "due process right to present a defense."

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense."   *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (citation omitted).   This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process."   *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate

demands of the adversarial system").   As the Supreme Court has recognized, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."   *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006).

The logic of Petitioner's argument appears to be two-fold.   First, Petitioner appears to argue that, if he had taken a polygraph examination, he would have passed and this result would have foreclosed trying him for the crimes in question. Petitioner also appears to argue that even if he was subjected to trial, he would be permitted to introduce into evidence the results of his polygraph examination. Neither argument advances Petitioner's cause.

First, any argument that Petitioner would have passed a polygraph examination is pure speculation.   There is no evidence that Petitioner has ever been administered a polygraph examination regarding the events in question.   Moreover, even had Petitioner passed a polygraph examination, such would not have obligated the State to forego its prosecution of Petitioner.   *See, e.g., People v. Carroll*, 2013 WL 6124227 at *13 (Mich. Ct. App., Nov. 21, 2013) (while Michigan law affords a defendant charged with criminal sexual conduct (CSC) the right to undergo a polygraph examination, nothing in Michigan law obligates the State to dismiss the CSC charges if the defendant subsequently passes a polygraph examination).

40

Finally, to the extent Petitioner argues that he would have sought to admit at trial the results of a polygraph examination, such is misplaced.   Under Michigan law, the results of polygraph examinations are not admissible at trial.   *See, e.g., People v. Phillips*, 666 N.W.2d 657, 660-61 (Mich. 2003).   Moreover, the refusal by a state to permit the admission of polygraph results does not violate a criminal defendant's right to present a defense.   *See, e.g., United States v. Scheffer*, 523 U.S. 303, 308-12 (1998) (defendant's right to present a defense not violated by rule which absolutely prohibits introduction of polygraph results).

The trial court rejected this claim, a decision affirmed by both the Michigan Court of Appeals and Michigan Supreme Court.   Considering the relevant authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VI.     Equal Protection – Composition of the Jury

Petitioner asserts that the jury venire in this matter consisted of "no less than seventy prospective jurors," of which only four were African-American.   Petitioner further asserts that three of these four individuals were selected to be on the jury, only to be peremptorily dismissed by the prosecutor.   Petitioner asserts that this circumstance violated his right to the equal protection of the law.

41

Petitioner has expressly argued that the prosecutor's conduct vis-à-vis the selection of his jury violates the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 85 (1986), mandating that peremptory challenges to potential jurors not be employed for racially discriminatory reasons.   But Petitioner's claim also arguably implicates the Supreme Court's decision in *Duren v. Missouri*, 439 U.S. 357, 364 (1979), mandating that every criminal defendant has the right to be tried by a jury drawn from a fair cross-section of the community.   Accordingly, the Court will evaluate Petitioner's claim under both standards.

A.    *Batson*

As the Supreme Court has long recognized, the "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure."   *Batson v. Kentucky*, 476 U.S. 85 (1986).   The Supreme Court also long ago recognized that excluding black jurors on the basis of their race implicates a criminal defendant's constitutional rights.   *See Strauder v. West Virginia*, 100 U.S. 303, 310 (1879) (holding that an African-American criminal defendant's right to the equal protection of the laws is violated when he is tried before a jury from which African-Americans have been purposefully excluded "because of their color").

The *Batson* Court reaffirmed the principle that a "State's purposeful or deliberate denial to [African-Americans] on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause."   *Id.* at 84

42

(citation omitted).   Accordingly, the *Batson* Court held that "the State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause" which "forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89 (citations omitted).

When a criminal defendant alleges that a prosecutor has exercised a peremptory challenge in a racially discriminatory manner, the trial court must employ a three-step burden shifting analysis.   First, the defendant must make a prima facie showing that a peremptory challenge was exercised on the basis of race. *See Rice v. Collins*, 546 U.S. 333, 338 (2006).   If the defendant makes a prima facie showing that a peremptory challenge was exercised on the basis of race, the burden shifts to the prosecutor who must articulate a race-neutral rationale for the excusing the juror in question.   If the prosecutor offers a sufficiently neutral rationale for excusing the juror in question, the burden shifts back to the defendant who must establish that, despite the prosecutor's allegedly race-neutral rationale, the prosecutor purposely excused the juror for discriminatory reasons.   *Ibid.*

Petitioner's claim fails because it is premised entirely upon speculation. Petitioner asserts that three African-Americans were selected to sit on the jury only to be peremptorily dismissed by the prosecuting attorney.   But at no time during jury selection or trial did Petitioner assert any claim challenging the composition of

the jury or the prosecutor's use of peremptory challenges.   Thus, there is nothing in the record indicating the race of any of the jurors excused through the use of a peremptory challenge.[2]   Petitioner has failed to present evidence substantiating his claim that three African-Americans were selected to serve on his jury only to be peremptorily excused.   Simply put, Petitioner's *Batson* claim is based on unsubstantiated speculation.   Accordingly, Petitioner's *Batson* claim fails because Petitioner has failed to make a prima facie showing that any potential juror was excused on the basis of race.

    B.   <u>*Duren*</u>

The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."   U.S. Const. amend. VI.   The United States Supreme Court has long held that this right includes the right to be tried by a jury drawn from a fair cross-section of the community.   *See Berghuis v. Smith*, 559 U.S. 314, 319 (2010).   As noted above, Petitioner has arguably asserted a claim that his right to be tried by a jury drawn from a fair cross-section of the community was violated because no African-Americans sat on his jury.

---

2 The Court notes that one brief exchange during jury selection suggests that one of the potential jurors excused for *cause* was African-American.   (ECF No. 24-7, PageID.2531-32, Trial Transcript, July 12, 2011, at 208-09).

To establish a prima facie violation of the fair cross-section requirement, Petitioner must demonstrate: (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process.   *See Berghuis*, 559 U.S. at 327 (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

It must be noted, however, that Petitioner must show not only that the distinctive group in question was insufficiently represented on the venire from which his jury was selected, but that such was the case in other venires as well.   *See Duren*, 439 U.S. at 366 ("it was necessary for petitioner to show that the underrepresentation of women, *generally and on his venire*, was due to their systematic exclusion in the jury-selection process") (emphasis added); *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) ("defendants must show more than that their particular panel was unrepresentative").

Even if the Court assumes that African-Americans are a "distinctive group" in the relevant jurisdiction, Petitioner cannot satisfy the second or third prong of the analysis as he has presented neither argument nor evidence in support thereof. Accordingly, this claim raises no issue on which habeas relief may be granted.

## VII.   Prosecutorial Misconduct

Petitioner alleges that his right to a fair trial was violated by several instances of misconduct by the prosecutor.   Each of Petitioner's claims is addressed below.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."   *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).   The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).

Accordingly, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair."   *Gillard*, 445 F.3d at 897.   It must also be remembered that this Court "does not possess supervisory powers over state court trials" as "it is the responsibility of the state courts to police their prosecutors."   *Gordon v. Burt*, 2016 WL 4435355 at *11 (W.D. Mich., Aug. 23, 2016) (quoting *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000)).

46

A.    <u>Comments Regarding Petitioner's Failure to Testify</u>

Petitioner argues that he is entitled to relief because the prosecutor, during closing argument, improperly commented on his decision not to testify in his own behalf.    Specifically, Petitioner objects to the following comments:[3]

> *The first point on why Chandra Nyhof's testimony proves this case, I call it the category of the truth will out.    Why do we believe her?    Because she took the stand, she raised her hand, she took the oath, she sat there and she testified honestly.    She subjected herself to cross-examination and I submit [the defense] didn't do anything to her.*    Certainly nothing happened to her like happened to the defense witnesses in this case.    He asked these questions about well have you met with the prosecutor and she says yeah. What did he tell you?    We got the truth on our side, we don't really have to (indistinguishable).    I learned a long time ago if you want the truth all you got to do is stand there and ask what happened, what happened next and then what happened.    You don't need to meet our witnesses multiple times in the Full Moon Bar, the Half Moon Bar, the Blue Cheese Bar or any other bar.    We just let the evidence take care of itself.
>
> *The first category is truth will out.    She testified; she had the guts to testify.*    Secondly, the power of the details. Third, what's the one or two critical details that she uses? The most incredible detail that she uses, the most distinctive, important detail that she gives us is that she says I don't know who did it; I didn't see his face.    I suspect it's the maintenance man because he's about the only African-American I know around here.    Other than that – who makes up a rape story to get a particular person in trouble and tells the police they never saw his face, I can't say for sure it's him.

---

3 The italicized language represents the comments to which Petitioner objects.    The Court has, however, included the complete passage to provide context which is necessary to the analysis below.

> *The last thing I want to say is just this.   The testimony of the victim in this case is uncontroverted about what happened.*   The defense lawyer wants to stand here and say a bunch of things but just like remember we talked in jury selection about you know the defense lawyer asks a question and if you don't get the answer, you know the question is not the evidence.   What the lawyers say out here, what I'm saying right now and what Mr. Nolan says, is not evidence either.   *The only evidence about the defendant's position is in that statement to the police.*   That's the only evidence before you.   And that statement to the police is comingled with lies.   That statement to the police is first a statement of false alibi.   That statement to the police even after he changes from the false alibi still has him lying about going to see Sherod.   He's going out to buy beer at 2:30 in the morning.   *And that's the only version in front of you from the defendant.   And that's enough to defeat the testimony of the victim?*

(ECF No. 24-13, PageID.3603-04, 3606-07, 3657, Trial Transcript, July 18, 2011, 26-27, 29-30, 80).

Petitioner asserts that these comments constituted an improper commentary on his failure to testify and, therefore, violated his right to a fair trial.   In support of this claim, Petitioner relies on *Griffin v. California*, 380 U.S. 609 (1965), in which the Supreme Court announced that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."   *Id.* at 615.   While styled as a prosecutorial misconduct claim, Petitioner is also arguably asserting a claim that his Fifth Amendment rights were also violated.

48

Petitioner argues that he is entitled to relief because the prosecutor engaged in misconduct which violated the rule announced in *Griffin*.    The Michigan Court of Appeals analyzed the claim as a question of "prosecutorial misconduct."    To obtain relief based on a *Griffin* violation, Petitioner must not only establish that the prosecutor commented on his silence, he must also establish that such error "had substantial and injurious effect or influence in determining the jury's verdict."    On the other hand, to obtain relief based on a claim of prosecutorial misconduct, Petitioner must establish that the comments in question were improper and, moreover, that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."    *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

While these two analytical frameworks are similar, they are nevertheless distinct inquiries vindicating different, albeit related, rights: the right to remain silent and the right to a fair trial.    This matter is further complicated by the fact that the Sixth Circuit recently denied, in the context of a state prisoner seeking habeas relief in federal court, a *Griffin* claim by means of an analysis that appears to have combined the harmless error and prosecutorial misconduct analyses.    *See Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013).    The Court, interpreting Petitioner's pro se petition indulgently, will analyze this particular claim under both the *Griffin* and prosecutorial misconduct frameworks.

49

1.    *Griffin*

To assess whether a prosecutor's comments violated a criminal defendant's Fifth Amendment rights, the Court examines the following factors: (1) did the prosecutor "manifestly intend" to comment on the defendant's Fifth Amendment right not to testify or would a jury "naturally and necessarily" interpret the remark that way; (2) was it an isolated occurrence or part of an extensive patters; (3) how strong was the prosecution's other evidence; and (4) did the judge provide a curative instruction.    *See Webb v. Mitchell*, 586 F.3d 383, 395-96 (6th Cir. 2009).

While it is improper to comment on a criminal defendant's right to not testify, a prosecutor may summarize the evidence, comment on the evidence's "quantitative and qualitative significance," respond to the defense's reasonably likely arguments and strategy, and argue reasonable inferences from the evidence.    *Id.* at 396-97. Furthermore, violations of the *Griffin* rule constitute trial errors subject to harmless error analysis.    *See, e.g.*, *United States v. Hasting*, 461 U.S. 499, 507-09 (1983).

The Michigan Court of Appeals found that the comments in question did not constitute an effort by the prosecutor to comment on Petitioner's right to not testify. Specifically, the court found that, read in context, the prosecutor's comments were part of a larger argument addressing why the jury should find Chandra Nyhof credible.    *Jones*, 2014 WL 576198 at *20.    The court further found that the statements in question were part of a larger argument "concerning the admissibility of defense counsel's statements and a commentary on the facts in evidence."    *Id.*at

*21.  The court concluded, therefore, that the prosecutor's comments did not constitute commentary regarding Petitioner's decision not to testify.  *Id.* at *20-21.

This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Moreover, even if the Court were to find the statements in question constituted comments regarding Petitioner's right to not testify, the Court finds such to be harmless.  The comments did not constitute a direct reference on Petitioner's right to remain silent or failure to testify.  Moreover, the comments were isolated and the jury was instructed that Petitioner had the right not to testify and must be presumed innocent.  (ECF No. 24-13, Trial Transcript, July 18, 2011, at 81-99).  Finally, the evidence against Petitioner was substantial.  Thus, the Court finds that the challenged comments did not have a substantial and injurious effect or influence in determining the jury's verdict in this matter.

## 2.    Prosecutorial Misconduct

To establish that he is entitled to relief based upon a claim on prosecutorial misconduct, Petitioner must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Gillard*, 445 F.3d at 897.  When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis.  The Court must first determine whether "the prosecutor's conduct and remarks were improper."

51

*Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).   If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal."   *Id.* at 759.   When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.   *Ibid.*

For the reasons discussed above, the Court agrees with the Michigan Court of Appeals that the comments in question were not improper.   Moreover, even if the Court assumes that the comments were improper, consideration of the relevant factors reveals that relief is not appropriate.   The challenged comments were isolated and were unlikely to have mislead the jury or prejudiced Petitioner. Moreover, the Court is not persuaded that the comments constituted a deliberate attempt to comment on Petitioner's failure to testify, but instead appear to have been intended to persuade the jury that Chandra Nyhof was worthy of belief as well as a response to comments made by defense counsel.   Finally, the evidence against Petitioner was substantial.

The Michigan Court of Appeals found that the comments in question neither constituted prosecutorial misconduct nor violated Petitioner's Fifth Amendment right to remain silent and not testify.   The Court concludes that this determination was

neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, the undersigned recommends that this claim be denied.

B.    Additional Claims of Prosecutorial Misconduct

Petitioner additionally asserts several instances in which the prosecutor allegedly engaged in misrepresentation of facts, made reference to facts not in evidence, and stated a personal belief in the credibility of a witness.   Each of these arguments is addressed below.

1.    Melissa Sweney's Testimony

As previously noted, Melissa Sweney testified that she was involved in a relationship with Petitioner.   Sweney also testified that she once encountered an unknown woman at Petitioner's residence.   Sweney indicated that she was later shown an image which Petitioner's counsel claimed was of Chandra Nyhof. According to Sweney, the woman depicted in this photograph was the unknown woman she observed at Petitioner's residence.

During closing argument, the prosecutor referenced Sweney's testimony with the following comments that Petitioner argues deprived him of the right to a fair trial:

> So Chandra goes to the hospital and a date-stamped picture was taken. That's what she really looked like and she doesn't have any blonde hair. She has some carmel highlight.   She doesn't have a blonde – she doesn't have two-toned hair.   She doesn't have blonde hair in the front.   They got caught lying, just like he trusted that she would for him.   They get

caught in another lie because they relied on an old picture from a Facebook entry two years old.

(ECF No. 24-13, PageID.3618-19, Trial Transcript, July 18, 2011, 41-42).

Petitioner objects to the prosecutor's statement on two grounds: (1) there was no evidence that the photograph shown to Sweney was two years old, and (2) there was no evidence that the photograph in question was obtained from Facebook.

The photograph of Chandra Nyhof that Petitioner's counsel presented to Sweney was identified as Exhibit AA. (ECF No. 24-9, PageID.2947-53, Trial Transcript, July 14, 2011, 20-26). When Chandra Nyhof's daughter, Ashley Bush, was later shown Exhibit AA, she testified that the photograph was two years old. (ECF No. 24-11, PageID.3419, Trial Transcript, July 15, 2011, 191). As for where the photograph originated, it was Petitioner's counsel that suggested that it was obtained from Facebook. (ECF No. 24-9, PageID.2949-50, Trial Transcript, July 14, 2011, 22-23). While Sweney was unsure whether the photograph was located on Facebook, she confirmed that the photograph originated on the internet. (*Id.*).

Petitioner's argument is without merit. The prosecutor's comments regarding the age of the photograph was supported by the evidence. Moreover, while there was not testimony establishing that the photograph was obtained from Facebook, as the Michigan Court of Appeals concluded such was a reasonable inference from the evidence. *Jones*, 2014 WL 576198 at *21. As the Michigan Court of Appeals further observed, given the evidence that the photograph was obtained from the internet,

Petitioner could not have been prejudiced by the prosecutor's apparent misstatement as to the particular website from which the photograph was obtained.    *Ibid.*

>    2.    Tara Glaser Paying for Petitioner's Counsel

Lynn Glaser testified that her daughter, Tara, was paying the cost of Petitioner's legal representation.    (ECF No. 24-11, PageID.3326-27, Trial Transcript, July 15, 2011, at 98-99).    In his closing argument, the prosecutor stated that "the Glasers are paying for [Petitioner's] lawyer.    Room for finding any bias there?"    (ECF No. 24-13, PageID.3620, Trial Transcript, July 18, 2011, at 43).    Petitioner argues that the prosecutor's misstatement of the evidence violated his right to a fair trial.

The Michigan Court of Appeals rejected this claim on the ground that the prosecutor's statement "was not clearly or obviously a reference to a fact not in evidence."    *Jones*, 2014 WL 576198 at *22.    This is not an unreasonable assessment. Moreover, even if the prosecutor's comment is deemed a factual misstatement, the Court fails to discern how such deprived Petitioner of the right to a fair trial.    It is undisputed that Tara Glaser paid the cost of Petitioner's legal defense.    Moreover, while Lynn Glaser denied paying the cost of Petitioner's attorney, she did concede that she "assisted" her daughter locate and assess possible attorneys to represent Petitioner.    (ECF No. 24-11, PageID.3351-52, Trial Transcript, July 15, 2011, at 123-24).

It is likewise undisputed that Lynn Glaser had a close relationship with Petitioner.  Glaser described Petitioner as "an adopted son," afforded him access to her residence, permitted him to drive her vehicles, and allowed him to live in one of her residences.  Thus, while it may have been inaccurate for the prosecutor to insinuate that Lynn Glaser was paying the cost of Petitioner's defense, the prosecutor's larger point, that Glaser's relationship with Petitioner could cause someone to question her objectivity, was supported by the evidence.

3.    Did Lynn Glaser Testify Untruthfully

Less than three weeks before his trial for sexually assaulting Chandra Nyhof, Petitioner was tried for failing to comply with the Michigan Sex Offender Registration Act.  (ECF No. 24-4, PageID.1881-82, Trial Transcript, June 23, 2011, at 18-19). During the course of this earlier trial, Lynn Glaser conceded that Petitioner occasionally stayed at her second residence, but she denied that Petitioner actually resided there.  (*Id.*, PageID.2102-03, 2106).  At Petitioner's subsequent sexual assault trial, however, the prosecutor established that Glaser's prior testimony that Petitioner never lived in her second residence was false.  (ECF No. 24-11, PageID.3333-35, Trial Transcript, July 15, 2011, at 105-07).

In closing argument at Petitioner's sexual assault trial, the prosecutor commented on this aspect of Lynn Glaser's testimony.  Specifically, the prosecutor argued that Lynn Glaser committed "blatant perjury" and was "a perjurer."  (ECF No. 24-13, PageID.3620-21, Trial Transcript, July 18, 2011, at 43-44).  The Michigan

56

Court of Appeals rejected Petitioner's prosecutorial misconduct claim on the ground that "the prosecutor's statement that Lynn Glaser was a perjurer was a reasonable inference from the evidence." *Jones*, 2014 WL 576198 at *22.

4.    Photographs of the Glaser Residence

As previously noted, Lynn Glaser owned multiple houses. One of these houses was located less than one-eighth mile from Chandra Nyhof's residence. (ECF No. 24-10, PageID.3075-76, Trial Transcript, July 14, 2011, at 101-02). Glaser's other house, the one where Petitioner lived, was located elsewhere. (ECF No. 24-11, PageID.3331-32, Trial Transcript, July 15, 2011, at 103-04).

During cross-examination, Petitioner's counsel questioned Chandra Nyhof regarding statements she made to the police following her assault. Specifically, Nyhof conceded that she told the police that Petitioner "lived up the road" in one of the Glaser's houses. (ECF No. 24-10, PageID.3094, Trial Transcript, July 14, 2011, at 120). Nyhof reported that Petitioner lived "up the road" because "he had been there a lot." (*Id.*).

In an apparent attempt to ascertain which of the Glaser's houses Nyhof was referencing, counsel asked Nyhof if the house to which she was referring was brick, to which Nyhof responded, "yes." (*Id.*). Nyhof then reiterated that she was referring to "the house up on the corner," by which Nyhof presumably was referring to the Glaser's house located less than one-eighth mile from her own residence. (*Id.*). Counsel responded by stating that the house, nearest to Nyhof, in which the Glasers

resided was constructed with aluminum siding whereas the second house where Petitioner resided was constructed with brick.  (*Id.*).   Nyhof responded that she was not sure how either of Lynn Glaser's houses were constructed.  (*Id.*, PageID.3094-95).

The point of this line of questioning appears to have been an attempt by Petitioner's counsel to establish that Nyhof was more familiar with Petitioner than she asserted, and had, in fact, visited the house where Petitioner resided as Melissa Sweney suggested.  To rebut this strategy, the prosecutor cross-examined Lynn Glaser regarding a series of photographs, taken by Glaser at the request of Petitioner's counsel, of the house in which Glaser resided.  (ECF No. 24-11, PageID.3322-25, 3344, 3354, Trial Transcript, July 15, 2011, at 94-97, 116, 126). Upon seeing the photographs, Glaser conceded that they revealed only three sides of her house, failing to display the one side of her house constructed of brick.  (*Id.*, PageID.3322-25).   It appears that following this exchange, Petitioner declined to seek the admission of the photographs in question.

In closing argument, the prosecutor argued that Lynn Glaser was not worthy of belief.   Specifically, the prosecutor noted that Glaser had taken a series of photographs which inaccurately depicted the construction of her house.   Insinuating that Glaser took these photographs with the intention of having them admitted as evidence, the prosecutor asked the jury, "what were they trying to pull on you?" (ECF No. 24-13, PageID.3621-22, Trial Transcript, July 18, 2011, 44-45).   The

prosecutor ended his argument by stating that, "I can't think of in 27 years a witness that's been caught in more lies."  (*Id.*, PageID.3622).  Petitioner argues that the prosecutor's argument was improper and deprived him of the right to a fair trial.

The Michigan Court of Appeals found that the prosecutor's comment was improper in that it "conveyed his belief, on the basis of personal experience, that Lynn Glaser was not a credible witness."  *Jones*, 2014 WL 576198 at *22.  The court further found, however, that the prosecutor's comment did not deprive Petitioner of a fair trial.  *Ibid.*  As the court observed, the prosecutor's comment was isolated and the jury is presumed to have followed the trial court's instructions that the lawyer's statements were not evidence and that they had to determine for themselves whether any witness was worthy of belief.  *Ibid.*  The court further observed that the prosecutor articulated "several admissible arguments concerning Lynn Glaser's credibility."  *Ibid.*

With respect to these additional claims of prosecutorial misconduct, addressed in subsections (B)(1)-(B)(4) above, the decision by the Michigan Court of Appeals rejecting such is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, these claims present no basis for habeas relief.

## VIII.  Ineffective Assistance

Finally, Petitioner asserts several claims that his trial and appellate attorneys rendered ineffective assistance thereby depriving him of the right to a fair trial. Each of Petitioner's claims is addressed separately below.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  The issue is whether counsel's

representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 562 U.S. at 122.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Ibid.* (citations omitted).  As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.    Failure to Predict Trial Court's Rulings

After jury selection, but before opening statements, Petitioner moved to exclude evidence of the incident involving Petitioner and Lori Cuti.  (ECF No. 24-7,

PageID.2569-70, Trial Transcript, July 12, 2011, at 246-47).    In response, the trial judge observed that the prosecutor was not seeking to introduce the evidence in its case-in-chief, but was instead only considering to present such in rebuttal.    (*Id.*, PageID.2570-73).    The trial judge then concluded that he could not assess the evidence's admissibility on rebuttal until Petitioner had presented his evidence. (*Id.*).

Petitioner was dissatisfied with this approach, however, because whether the evidence in question was admitted impacted his trial strategy, including whether he would testify.    (*Id.*, PageID.2569-73).    Despite the trial court's decision to delay ruling on the matter, Petitioner's counsel indicated in his opening statement that Petitioner would testify.    (ECF No. 24-7, PageID.2602-03, 2606-07, Trial Transcript, July 12, 2011, 279-80, 283-84).    Following Petitioner's presentation of evidence, but before Petitioner rested, the trial judge ruled that considering the evidence presented by Petitioner, the prosecutor could offer in rebuttal the evidence regarding the Lori Cuti incident.    (ECF No. 24-11, PageID.3398-3400, Trial Transcript, July 15, 2011, at 170-72).    Because of this ruling, Petitioner decided that he would not testify.    (*Id.*, PageID.3402-06).

Petitioner argues that his attorney rendered ineffective assistance by failing to foresee the trial judge's ruling vis-à-vis the Lori Cuti incident and that such would cause Petitioner to decide not to testify.    According to Petitioner, his attorney should have predicted the course of future events and refrained from telling the jury in his

opening statement that Petitioner would testify.   Petitioner's claim fails because he cannot satisfy either prong of the analysis.

When assessing this claim, the Court must "indulge a strong presumption" that counsel's actions constituted "sound trial strategy." *Carter v. Bogan*, 900 F.3d 754, 773 (6th Cir. 2018).   Moreover, strategic choices made after thorough investigation are "virtually unchallengeable." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010).   The Michigan Court of Appeals concluded that counsel's decision to indicate in his opening statement that Petitioner would testify was a reasonable strategic decision. *Jones*, 2014 WL 576198 at *10-11.

As the Michigan Court of Appeals observed, counsel "was faced with a dilemma – he could either make an opening statement on the basis of his anticipation of the trial court's ruling, or he could allow the prosecutor's theory of the case to go unrebutted until Jones's case in chief." *Id.* at 11.   That counsel failed to predict how the trial court would rule on what the Michigan Court of Appeals characterized as a "close evidentiary question" neither renders counsel's decision unreasonable nor reflects a failure to investigate or prepare.

Moreover, even if counsel's decision was deficient, Petitioner cannot establish that he was prejudiced by such.   As the Michigan Court of Appeals indicated, "many of the facts that defense counsel stated the jury would hear from [Petitioner] were provided by other witnesses . . . [t]hus, to the extent that the jury did not hear from

Jones the facts that defense counsel mentioned in his opening, the jury heard most of these facts from other witnesses."  *Id.* at *11.

The denial of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim presents no basis for habeas relief.

B.    <u>Failure to Investigate and Address Chandra Nyhof's Perjury</u>

As discussed above, Petitioner asserts that Chandra Nyhof testified falsely at trial.   Petitioner now argues that his trial and appellate counsel were ineffective for failing to "investigate and address" this issue.   As discussed above, however, Petitioner has failed to establish that Nyhof testified falsely at trial.   Because Petitioner cannot establish that Nyhof testified falsely at trial, he cannot demonstrate that he was prejudiced by his attorneys' actions.

C.    <u>Failure to Call Witnesses</u>

Petitioner next argues that his trial attorney was ineffective for "failing to call" the following witnesses: (1) Melissa Sweney; (2) Greg Bush; and (3) Scott Plank.

While Sweney did testify, Petitioner argues that his attorney should have recalled Sweney so that she could identify Chandra Nyhof as the woman she observed at Petitioner's residence approximately three days prior to the date Petitioner sexually assaulted Nyhof.   This claim fails for two reasons.   First, Plaintiff's

assertion that Sweney would have positively identified Nyhof as the woman she encountered at Petitioner's residence is pure speculation.   Second, as discussed above, Sweney identified Nyhof from a photograph that she was shown.   Thus, even if counsel's failure to recall Sweney was deficient, Petitioner cannot establish that he suffered prejudice therefrom.

As for counsel's failure to call Bush and Plank to testify, Petitioner's assertion that these witnesses would have presented testimony favorable to his defense is pure speculation.   Thus, even if counsel's failure to call these witnesses was deficient, Petitioner cannot establish that he suffered prejudice therefrom.

### D.    Failure to Assert Suggestive Identification Issue

As discussed above, Petitioner asserts that his right to a fair trial was violated by the admission of Lori Cuti's in-court testimony identifying him as the man who came to her house to look at her truck.   Petitioner asserts that his appellate counsel was ineffective for failing to raise this issue on his appeal as of right.   As discussed above, Petitioner has failed to establish that the introduction of the testimony in question violated his right to a fair trial.   Thus, counsel's failure to assert this claim on appeal did not prejudice Petitioner.

### E.    Failure to Assert Polygraph Issue

As discussed above, Petitioner argues that his right to present a defense was violated because his trial attorney failed to inform him of his right to take a polygraph examination.   Petitioner now argues that his appellate counsel was ineffective for

65

failing to assert this issue on appeal.   This claim is without merit for the reasons articulated above.   As such, counsel's failure to assert this claim on appeal did not prejudice Petitioner.

      F.     <u>Failure to Assert *Batson* and *Duren* Issues</u>

Finally, Petitioner argues that his trial counsel was ineffective for failing to assert at trial the *Batson* and *Duren* claims discussed above.   Again, because these claims have no merit, counsel's failure to assert such did not prejudice Petitioner.

With respect to the claims asserted in Sections (B)-(F) immediately above, the trial court rejected these claims, a decision affirmed by both the Michigan Court of Appeals and Michigan Supreme Court.   Considering the relevant authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, these claims raise no issue upon which habeas relief may be granted.

<u>**CONCLUSION**</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.   Accordingly, the undersigned recommends that Jones' petition for writ of habeas corpus be denied.   The undersigned further recommends that a certificate of

appealability be denied.    *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.    28 U.S.C. § 636(b)(1)(C).    Failure to file objections within the specified time waives the right to appeal the District Court's order.    *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: February 26, 2020

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge

67